ANTHONY E. SPITALERI AND ANITA N. SPITALERI, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 57845. Filed July 31, 1959.

*Anthony E. Spitaleri, pro se.*
*Raymond T. Mahon, Esq.,* for the respondent.

OPPER, *Judge:* Respondent determined deficiencies in income tax and in additions to tax as follows:

| Year | Deficiency | Additions to tax—I.R.C. 1939 | | |
|---|---|---|---|---|
| | | Sec. 293(b) | Sec. 294(d)(1)(A) | Sec. 294(d)(2) |
| 1949 | $797.04 | $398.52 | $71.75 | $47.82 |
| 1950 | 274.76 | 137.38 | 24.73 | 16.49 |
| 1951 | 656.98 | 328.49 | 59.13 | 39.42 |
| 1952 | 1,508.08 | 754.04 | 135.72 | 90.48 |

The issues are: (1) Whether petitioners understated income from accounting fees from 1949 through 1952; (2) whether petitioners understated income from a loan business in 1952; (3) whether petitioner Anthony E. Spitaleri's mother was a dependent from 1949 through 1952; (4) whether certain amounts constituted accrued interest and were deductible in 1950 and 1951; (5) whether an amount paid for a law school correspondence course was an ordinary and necessary trade or business expense in 1950; (6) whether petitioners are entitled to medical expense deductions in excess of the amount allowed by respondent from 1950 through 1952; (7) whether assessment of the deficiency for 1949 is barred by the statute of limitations; (8) whether any part of any deficiency is due to fraud with intent to evade tax; and (9) whether petitioners are liable for additions to tax under sections 294(d)(1)(A) and 294 (d)(2).

FINDINGS OF FACT.

The stipulated facts are found.

Anthony E. Spitaleri, hereafter called petitioner, and Anita N. Spitaleri, husband and wife, resided in Pittsfield, Massachusetts, and filed joint returns for the years in controversy with the collector or director of internal revenue for the district of Massachusetts on an accrual method of accounting.

*Issue 1. Understatement of Accounting Fees.*

Petitioner, a certified public accountant, conducted his accounting practice as a sole proprietorship. From 1949 through 1952, petitioner's clientele numbered approximately 46, 52, 59, and 61, respectively.

Some of the checks received by petitioner during the years in issue for accounting services rendered in the respective years, except as otherwise noted, were:

| Drawer | 1949 | 1950 | 1951 | 1952 |
|---|---|---|---|---|
| Louis and Eddie's Restaurant | [1] $340 | [2] $570 | [3] $140 | |
| Lee Restaurant | 500 | | | |
| Berkshire Woolen Company | 3,000 | | 1,000 | |
| Lenox Library Association | 100 | 100 | 100 | $100.00 |
| Lenox School | 250 | | 175 | 175.00 |
| Hagyard's Lenox Pharmacy | | | 250 | |
| Industrial Equipment and Engineering Company | | | 240 | |
| Wendover Dairy | | | | 290.00 |
| Filkins | | | | 235.10 |
| Total | 4,190 | 670 | 1,905 | 800.10 |

[1] Represents at least 3 checks.
[2] Represents 11 checks.
[3] Represents 4 checks.

The checks in each year will sometimes hereafter respectively be called the 1949 checks, 1950 checks, 1951 checks, and the 1952 checks. The 1951 and 1952 Lenox School checks were received in 1952 and 1953, respectively.

Petitioner did not record the 1949 checks in his 1949 cash receipts book. On June 16, 1958, petitioner submitted to respondent a "breakdown" of the figure for accounts receivable on his 1949 books and records, hereafter called the 1949 chart. The 1949 chart also indicated cash collected, income accrued, and work in process. An amount of $4,190 appeared in a column designated as "Other Credits" and was recorded as cash received and income accrued.

Respondent determined that petitioner omitted from his 1949 income the 1949 checks.

During an investigation of petitioner's returns for the years 1950 through 1952, petitioner gave one of respondent's agents his respective bank deposit slips and cashbooks. The agent then went to most of petitioner's clients and secured as many canceled checks payable to petitioner from 1950 through 1952 as were possible. After comparing the bank deposit slips with the canceled checks the agent determined that the 1950, 1951, and 1952 checks did not appear on a schedule of payments received from clients in the respective years, and they were not deposited in petitioner's checking account maintained at the Berkshire Trust Company. Respondent determined that petitioner omitted from his income, in each respective year, the 1950, 1951, and 1952 checks.

In 1951, petitioner owed Wm. Less & Co., Inc., hereafter called Less, $151.80. Thereafter, on October 19, 1951, petitioner billed Less $325 for services rendered in 1951. Less paid petitioner by check the amount of $173.20, and simultaneously issued a check payable to cash in the amount of $151.80. Respondent determined that petitioner omitted this $151.80 from his 1951 income.

In October, November, and December of 1952, petitioner made currency deposits of $500, $1,000, and $1,000, respectively, in his checking account maintained at the Berkshire Trust Company. Petitioner recorded these deposits on his books as a debit to cash and a credit to capital account. Respondent determined that petitioner omitted these deposits from his 1952 income.

Petitioner rendered services to the Pittsfield Sporting Goods Company and Hagyard's Lenox Pharmacy, hereafter called Pittsfield and Hagyard, respectively. Pittsfield and Hagyard paid petitioner all amounts due. Petitioner's 1952 "Record of Income" and return did not indicate any bad debt deductions. Petitioner, by means of an adjusting entry, charged off as uncollectible in 1952 a Pittsfield account of $435 and a Hagyard account of $250. Respondent determined that petitioner omitted these amounts from his 1952 income.

On or about January 31, 1956, petitioner submitted to respondent a "breakdown" of the figure for accounts receivable on his books and records for the years 1950, 1951, and 1952, hereafter called the 3-year chart. The 3-year chart also indicated cash collected, income accrued, and work in process. The amounts of $670, $2,056.80, and $3.985.10 appeared in a column designated as "Other Credits" and were recorded as cash received and income accrued. Petitioner computed the amounts appearing in the "Other Credits" column of the 3-year chart from respondent's deficiency notice.

Petitioner's returns for the years in issue indicated the following (in even dollars):

|  | 1949 | 1950 | 1951 | 1952 |
|---|---|---|---|---|
| Gross receipts per return | $16,250 | $17,355 | $21,335 | $21,070 |
| Net profit and adjusted gross income | 2,655 | 2,699 | 3,782 | 2,909 |
| Itemized deductions | 1,168 | 1,213 | 1,996 | 1,133 |
| Exemptions | 1,500 | 1,800 | 1,800 | 1,800 |
| Taxable income | 0 | 0 | 0 | 0 |

Total income accrued, including amounts designated as "Other Credits," by petitioner according to the 1949 chart and the 3-year chart was (in even dollars):

| 1949 | 1950 | 1951 | 1952 |
|---|---|---|---|
| $16,250 | $17,355 | $21,335 | $21,070 |

Petitioner, desirous of obtaining a loan, submitted the following financial statement to the Pittsfield National Bank:

ANTHONY E. AND ANITA SPITALERI
STATEMENT OF FINANCIAL CONDITION—DECEMBER 26, 1952

| | | | |
|---|---|---|---|
| Cash | $500 | Notes Payable | $300 |
| Accounts Receivable | 8,000 | Mortgage | 7,500 |
| Real Estate | 11,500 | | |
| Furniture and Equipment | 3,000 | | |
| Mercury Auto | 600 | Net Worth | 15,800 |
| | $23,600 | | $23,600 |

Net Income ___ $5,000 yearly
Insurance ___ 10,000 Aetna Life Insurance

On December 26, 1952, the Pittsfield National Bank loaned petitioner $1,500.

## Issue 2.   Understatement of Income From Loan Business.

In the latter part of 1951, petitioner and an attorney entered into a loan business for the purpose of obtaining more accounting and legal business. They borrowed funds from one group of individuals at a certain rate of interest and then loaned these same funds to other individuals at a higher rate of interest, the difference representing a profit.

Petitioner permitted the attorney to share in the profits in payment for legal services rendered.

This loan business was reflected on petitioner's books by a series of debits and credits to a "Trustee Account."

In 1952, the gross profit derived from this loan business was $1,920.50. This figure represented the difference between $2,042 of interest paid to creditors and $3,962.50 of interest received from debtors.

The attorney received $200 of the gross profits from the loan business. Respondent determined that petitioner included $200 of the gross profits in his return and omitted $1,520.50.

## Issue 3.   Credit for Dependent.

From 1949 through 1952, petitioner's mother lived with petitioner's sister and brother-in-law, hereafter called the Nidos, in Long Island, New York. The Nidos claimed the mother as a dependent in their 1950, 1951, and 1952 returns.

From 1949 through 1952 petitioner gave his mother cash. He also sent her checks in the amounts of $100, $15, and $15 from 1950 through 1952, respectively. On occasion petitioner's brother gave money to the mother.

Respondent disallowed petitioner's claim to a dependency exemption for his mother in each of the years in issue.

Petitioner did not contribute over one-half his mother's support for any year from 1949 through 1952.

### Issue 4. Accrued Interest Expenses.

In 1950, or sometime prior thereto, the Plattsburg National Bank made a loan to petitioner. Petitioner deducted on his 1950 and 1951 returns interest in the respective amounts of $90 and $120, which respondent disallowed.

### Issue 5. Law School Correspondence Course Expense.

In 1950, petitioner paid $135.35 to the Blackstone Law School of Chicago, Illinois, hereafter called Blackstone, for books and a correspondence course. Prior to the trial of this case petitioner received a bachelor of laws degree from Blackstone.

Respondent disallowed petitioner's deduction of this amount as a business expense.

The 1950 payment to Blackstone was not an ordinary and necessary trade or business expense.

### Issue 6. Medical Expenses.

Subject to the statutory 5 per cent diminution, petitioner claimed, on his 1950, 1951, and 1952 returns, medical expenses in the respective amounts of $547, $1,448.55, and $585. From 1950 through 1952, petitioner paid by check the respective amounts of $194.20, $1,099.15, and $334 for medical expenses. Respondent disallowed those amounts which exceeded $194.20, $1,099.15, and $334 for 1950, 1951, and 1952, respectively. Respondent did not disallow the amounts claimed for 1949.

### Issues 7-9. Fraud Penalty and Additions to Tax.

No part of any deficiency is due to fraud with intent to evade tax. Petitioner did not file false and fraudulent returns with intent to evade tax.

From 1950 through 1952 petitioner, without reasonable cause, failed to file a declaration of estimated tax and substantially underestimated his estimated tax.

#### OPINION.

While it may impose an additional and possibly difficult burden on respondent, we think it necessary that greater investigation and more convincing evidence be produced to show fraud by an accrual method taxpayer than appears here. Our finding of fact accordingly disposes of this issue in petitioner's favor.

Merely proving that items of cash were received by petitioner without evidence as to the year in which the receipts accrued, and with no showing that more was accruable than he reported, is of no probative value in ascertaining whether petitioner understated his income. He reported some gross income in every year in issue, and it is as consistent with his innocence as with fraud, that what he received was either included in his reported income or represented collections on previously accrued accounts. We cannot base a finding of fraud on such a record. *James Nicholson,* 32 B.T.A. 977, 989, affd. (C.A. 8) 90 F. 2d 978. No net worth case was attempted, and with the burden on respondent we must make our assumptions in petitioner's favor where clear and convincing proof is lacking. *James Nicholson, supra;* see *John Marinzulich,* 31 T.C. 487.

The year 1949 is concededly barred by this conclusion. As to the other adjustments, however, we must sustain respondent, because petitioner has failed to carry his burden of proof. *James Nicholson, supra; Leonard B. Willits,* 36 B.T.A. 294. Most of the disputed items could have been eliminated by production of detailed books and records, but these were not forthcoming. Petitioner's mere statements are not sufficient, especially where, as here, contradictions, evasions, and irrelevancies make his entire testimony wholly unreliable.

It is unnecessary to deal with each item individually, but what we have just said is as applicable to the disallowed deductions[1] for interest, medical expense, and dependency credit as it is to amounts of understated income from the accounting and small loan businesses. And petitioner has not shown that participation in a law school correspondence course is necessary for one who is already a practicing accountant. *Welch* v. *Helvering,* 290 U.S. 111.

Petitioner's sole other contention, that respondent's determination was so arbitrary as not to be effective, see *Helvering* v. *Taylor,* 293 U.S. 507, is not supported by the record. In the absence of detailed books of account or other methods of determining petitioner's true income, respondent was entitled to make the best estimation he could with the facts at his command. *Burka* v. *Commissioner,* (C.A. 4) 179 F. 2d 483, affirming a Memorandum Opinion of this Court. This is especially true with respect to the items claimed for which petitioner furnished him no substantiation.

The additions to tax under section 294(d) (1) (A) for 1950 through 1952 are likewise sustained for failure of proof. The additions to tax under section 294(d) (2) for the same years are disallowed pursuant to *Commissioner* v. *Acker,* 361 U.S. 87.

*Decision will be entered under Rule 50.*

---

[1] The so-called bad debt deductions are in reality treated by respondent as additional unreported income. Petitioner apparently reduced his accruals for 1952 by offsetting supposedly uncollectible amounts already accrued. No proof of worthlessness having been produced, petitioner's income was understated for the year involved by the amount of the reduction, notwithstanding that no bad debts as such were specifically claimed.